IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FRANCINE GLADDEN, | ) | 8:12CV40 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff brings this suit to challenge the Social Security Commissioner's final administrative decision denying her application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.[1] For the reasons discussed below, the Commissioner's decision will be affirmed.

## I.  Procedural Background

Plaintiff protectively filed for SSI benefits on October 22, 2008 (Tr. 192-194). Her application was denied initially on January 8, 2009, with the Commissioner providing the following explanation:

---

[1] Section 1631(c)(3) of the Act provides that "[t]he final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).  Under the fourth sentence of section 405(g), "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

> You said that you were unable to work because of a learning disability. The evidence shows that you have learning problems and are prevented from doing work that is overly complex. However, you are not prevented from doing work that is simple in nature. Though you have a limited work history, you are not prevented from doing work that is basic in nature. We have considered your age of 31 years and 7 years of education in making this decision.

(Tr. 95) Plaintiff filed a request for reconsideration (Tr. 104-106), which was denied on March 10, 2009 (Tr. 107-124). The denial letter stated:

> You said that you were unable to work due to learning disability. Medical evidence shows that you have a history of some depression and some cognitive deficits. The evidence does not however show that you would be severely disabled by these issues. While it is recommended that you avoid highly complex types of work tasks, and jobs requiring highly frequent interaction with others, you should not be prevented from working. We have determined that your condition should not preclude you from simple, less stressful kinds of work and therefore must find that you do not qualify for disability benefits.

(Tr. 107) On March 23, 2009, Plaintiff requested an administrative hearing (Tr. 125).

A hearing was held before an administrative law judge (ALJ) on August 26, 2010 (Tr. 65-81). After listening to Plaintiff' testimony, the ALJ decided to order a consultative psychological examination, as Plaintiff's representative had requested (Tr. 76-80, 438). A second hearing was then held on January 13, 2011(Tr. 50-64). Plaintiff again testified, as did a vocational expert.

The ALJ, Ronald D. Lahners, issued a unfavorable decision on January 28, 2011, concluding that Plaintiff is not disabled because she is capable of performing jobs that exist in significant numbers in the national economy.[2] Evaluating Plaintiff's

---

[2] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

claim using the 5-step sequential analysis prescribed by Social Security regulations,[3] Judge Lahners made the following findings:

> 1. The claimant has not engaged in substantial gainful activity since October 22, 2008, the application date (20 CFR 416.971 *et seq*.).

> 2. The claimant has the following severe impairments: borderline intellectual functioning and learning disorder, resulting in slow pace (20 CFR 416.920(c)).

> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

> 4. Based on the record as a whole, the undersigned finds that, although the claimant has no physical impairments, clearly she would

---

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

[3]  The Eighth Circuit has described the procedure as follows:

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ('RFC')] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

have the residual functional capacity for at least light work, which is defined in 20 CFR 416.967 as work which involves lifting no more than 20 pounds occasionally with frequent lifting or carrying of objects weighing up to 10 pounds; sitting 6 hours in an 8-hour workday; and standing 6 hours in an 8-hour workday. She has unlimited use of the extremities. However, the claimant has a limited education and, as a result, would be limited to unskilled work that does not require her to carry out detailed instructions. She has difficulty getting along with people and, as a result, would have moderate limitation in getting along with peers and supervisors, and would be precluded from dealing with the general public.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was . . . 31 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education (7th grade) and is able to communicate in English (20 CFR 416.964).[4]

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 22, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 39-48)

---

[4] School records indicate Plaintiff actually completed ninth grade (Tr. 288).

On February 14, 2011, Plaintiff requested review of the ALJ's decision by the Appeals Council of the Social Security Administration (Tr. 31-32). On November 15, 2011, her representative submitted additional evidence consisting of medical records from Friendship Program, Inc., for the period from May 3, 2011 through September 12, 2011 (Tr. 6-27). The Appeals Council denied Plaintiff's request for review on December 14, 2011 (Tr. 1-6).[5] Among other things, it noted that the additional medical records could not affect the ALJ's January 28, 2011 decision because they pertained to a later time period (Tr. 2).

This action was filed on January 27, 2012 (filing 1). Plaintiff argues that (1) her depression is a severe impairment; (2) she is disabled because she meets the requirements of listing 12.05C for mental retardation; and (3) she cannot work at a competitive pace and would require additional supervision and repeated instructions.

## II. Evidence

The ALJ's decision contains a fairly detailed discussion of the evidence. First reviewing Plaintiff's testimony, the ALJ stated:

> The claimant was 31 years of age at the alleged onset date and is currently 33 years of age with a 7th grade education and no past relevant work. At the initial hearing, Ms. Gladden asserted she is unable to work due to her learning disability. She advised she completed the seventh grade and she can read and write, but her most severe problem is related to her inability to work at a fast pace. Ms. Gladden testified she reads and spells at the fifth grade level, and this was determined last year when she was attempting GED testing. She noted she had no problems in school and she was not in special education so she does not know why she had to repeat grades. She indicated she has difficulty sustaining

---

[5] The ALJ's decision thereupon became the final decision of the Commissioner. See *Van Vickle v. Astrue,* 539 F.3d 825, 828 (8th Cir. 2008).

concentration, she is depressed and has daily mood changes, she has crying spells that can last as long as a full day, and she has problems parenting. She reported she did not remember the last time she saw a doctor and she was not taking medications.

At the supplemental hearing, Ms. Gladden reported that, in the four months since the previous hearing she had registered with Vocational Rehabilitation and would soon start classes. She advised she had stopped attending counseling at one of her previous places because there were only male doctors. She noted difficulty getting along with others and, as a result, she has no friends. Ms. Gladden testified she has been charged with check fraud, but she was not guilty. She noted she has never learned to drive, and indicated her children are doing better. Ms. Gladden reported she is not currently on any medications and opined she does not believe she can work because of a learning disability and her problem getting along with coworkers. She testified she has never held a job and she has survived through the years on child support and living with her mother. She reported she receives $168.00 per month in ADC, half to the state and half to her; and she receives food stamps and medical.

(Tr. at 42-43) The ALJ next summarized medical records which predate Plaintiff's application for SSI benefits:

An assessment by the school psychologist on January 29, 1986 shows the claimant had achieved a verbal IQ of 81, performance IQ of 70, and full-scale IQ of 73 on the Wechsler Intelligence Scale for Children in 1983. On repeat testing in 1986, she obtained a verbal IQ score of 80, performance IQ score of 69, and full-scale IQ score of 72. She had reportedly worked at grade level in the first grade and was in a development room until she attended regular classes in the third grade. The psychologist reported the claimant had been functioning in the borderline intelligence range since 1983. (Exhibit 18E)

On June 13, 2008, Mr. Gladden was evaluated by Holly Filcheck, PhD, in an exam requested by a caseworker in connection with some issues with Child Protective Services. She reported she had left school in the eighth grade due to pregnancy and she had three children. On the

-6-

Wechsler Adult Intelligence Scale-III, she achieved a full-scale IQ of 68, verbal IQ of 69, and performance IQ of 73, placing her in the borderline range. The diagnoses were bipolar I disorder; parent-child relational problems; borderline personality disorder; borderline intellectual functioning; and a global assessment of functioning score of 45.[6] (Exhibit 3F)

The record shows she attended a couple of appointments and was subsequently seen by Rebecca Schmidt, MD, on August 11, 2008 who noted the need for ongoing outpatient medication management and continued participation in therapy. Dr. Schmidt diagnosed major depressive disorder; rule out borderline intellectual functioning; and a global assessment of functioning score of 45. (Exhibit 2F)

(Tr. 43)  The ALJ then summarized Plaintiff's post-application medical records:

On November 25, 2008, Ms. Gladden was seen by another therapist, John Erickson, CMSW, who cited tentative diagnoses of depressive disorder, rule out borderline personality, and a global assessment of functioning score of 60.[7] (Exhibit 4F/6-12) On February 3, 2009, Ms. Gladden sought a second opinion and was seen by Phil McLeod, PhD, who basically agreed with the earlier diagnoses from John Erickson, CMSW. Dr. McLeod noted as well that the claimant's insurance carrier required an exam by a psychiatrist or psychologist. He opined her fund of knowledge appeared to show functioning in the lower average range rather than borderline functioning, her attention and concentration were variable, her mood was indicative of undercurrent

---

[6] The *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (*DSM-IV-TR*) states that the GAF scale is used to report the clinician's opinion as to an individual's level of functioning with regard to psychological, social, and occupational functioning. *See DSM-IV-TR* 32 (4th ed. 2000). A GAF score of 41 to 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. *See id.* at 34.

[7] A GAF score of 51 through 60 is characterized by moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *See DSM-IV-TR* at 34.

anger and some depression, but she was well-oriented to time, place, and person and appeared to have intact recent and remote memory. (Exhibit 11F/7-9) The record shows the claimant was consistently seen by therapists from March 23, 2009 until April 13, 2009, but then cancelled late three times, ultimately being dismissed for lack of follow-through. (Exhibit l6F)

In an exam arranged by the State Agency with Joseph Rizzo, PhD, on December 30, 2008, the claimant was again administered the Wechsler Adult Intelligence Scale-III, which she advised she had just been given a few weeks earlier at Capstone. She obtained a full-scale IQ of 72, verbal IQ of 76, and performance IQ of 72, placing her in the borderline intellectual range. On the Wide Range Achievement Test-III, she was able to read at the fifth grade level, spell at the eighth grade level, and handle arithmetic problems at the fourth grade level. The results were considered valid and Ms. Gladden advised the examiner that she had recently lost her ADC and the ADC people felt she should be capable of finding a job. Dr. Rizzo opined the claimant seemed to be able to understand and remember short and simple instructions and could carry them out under structured supervision. . . .

On September 16, 2010, Ms. Gladden was evaluated by Ashley Wheeler, MD. She described her parenting shortcomings and her relationship issues. Fund of knowledge was below average, but she was able to converse without difficulty. She endorsed six of nine symptoms of depression including problems staying asleep, loss of interest, irritability, decreased energy, fluctuating appetite, and increased psychomotor activity. She was placed on medication. (Exhibit 18F)

(Tr. 44) The ALJ also provided a summary of medical opinions:

As for the opinion evidence, the State Agency psychological consultant concluded that Ms. Gladden had multiple moderate work-related limitations, but she would not be precluded from work activity. (Exhibits 7F, 8F, 9F, 10F, 12F) Consultative examiner, Dr. Rizzo, opined the claimant seemed to be able to understand and remember short and simple instructions and could carry them out under structured supervision. There was a question whether she could relate

-8-

appropriately to coworkers and supervisors, and she did not appear to be an individual who could adapt to changes in her environment easily. (Exhibit 5F) Treating source, Philip McLeod, PhD, opined her fund of knowledge appeared to show functioning in the lower average range rather than borderline functioning, her attention and concentration were variable, and her mood was indicative of undercurrent anger and some depression, but she was well-oriented to time, place, and person and appeared to have intact recent and remote memory. (Exhibit 11F/7-9) Treating source, Dr. Schmidt, advised Vocational Rehabilitation that complex, multiple tasks were likely to be overwhelming, so the claimant should be given single, simple tasks. (Exhibit 1F/1) . . .[8]

The claimant was referred by her representative for another psychological evaluation and was seen on August 13, 2010 by Beverly Doyle, PhD. On the Vineland Adaptive Behavior Scale in Socialization, Communication, and Daily Living, the claimant received a standard score of 99 in the average range. She reported being able to take care of herself, her children, and her home and she was able to communicate effectively, advising she had no friends and socialized only with family. Processing speed was measured at 71, two standard deviations below average, but commensurate with her ability level. Dr. Doyle opined she would have difficulty completing tasks in a timely fashion if they require visual motor processing. In a questionnaire, Dr. Doyle indicated the claimant had no limitation in many areas of functioning including her ability to deal with work stress (although as noted later, she based this on information from the claimant that was not accurate); her ability to complete a normal workday and work week without psychological interruptions; her ability to accept instructions and respond appropriately to criticism from supervisors or coworkers; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and her ability to interact appropriately with the general public. She noted the claimant did not have marked difficulties in maintaining concentration, persistence, or pace, although she would likely have uncontrolled crying

---

[8] The ALJ stated he was "giv[ing] the foregoing opinions great weight as they are consistent with each other and with the record as a whole." (Tr. 46)

spells when performing unskilled work during a normal workday. (Exhibit 14F) In an addendum, Dr. Doyle reported the claimant was not entirely honest about her past employment during the exam and that records indicate the claimant had held a number of jobs, but most of them had lasted for only short periods of time. She noted that past records indicate the claimant had been unable to live independently and she had numerous problems with upkeep of her home and care of her children. (Exhibit 15F)[9] . . . Dr. Doyle saw the claimant on only one occasion, however, her opinion is consistent with other opinions in the record and, although it shows the claimant performed at a slower speed and she might have difficulty completing tasks in a timely fashion if requiring visual motor processing, she opined Ms. Gladden did not have marked difficulties in maintaining concentration, persistence, or pace. (Exhibit l4F)

. . .

At the request of the undersigned, the State Agency arranged another psychological exam and the claimant was seen on September 23, 2010 by Julian Fabry, PhD. She was administered the Minnesota Multiphasic Personality Inventory, but her results were considered invalid because she over reported psychological difficulties. In particular, she over reported somatic symptoms that are rarely described by individuals with genuine medical problems. Her invalid profile indicated she endorsed behaviors that suggested cognitive deficiencies resulting in thought dysfunction and ideas of persecution and her responses suggested that her thinking was confused and diffuse. She had no problems with attention, but had some difficulties with concentration and short-term memory processing. It was at this time she confabulated and provided a profile that was unusual given her deficiencies. She was able to accomplish three out of six simple arithmetic problems that were verbally presented, and she had problems with subtraction, multiplication, and making change greater than a dollar. No difficulties were noted for addition, division, and making change for less than a

---

[9] The ALJ also found "this opinion is consistent with the record as a whole and is entitled to great weight."  (Tr. 46)

dollar. She had some slight difficulties with concept formation and her performance in this area was marginal. (Exhibit 17F)[10]

(Tr. 45-47)

### III. Discussion

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted). Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion. *See id.* Questions of law, however, are reviewed de novo. *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n2 (8th Cir. 1995).

### A. Step-Two Determination

Plaintiff contends the ALJ first committed reversible error at step two of the sequential evaluation process, when he found that her only severe impairments are "borderline intellectual functioning and learning disorder, resulting in slow pace." (Tr. 39) Plaintiff claims she is also severely impaired by depression.

The ALJ noted that Plaintiff has been diagnosed with depression, but he concluded there was not enough evidence to support a finding that her impairment met the duration requirement of 20 C.F.R. § 416.909 ("Unless your impairment is

---

[10] The ALJ found "this opinion is entitled to great weight with regard to the conclusion that Ms. Gladden demonstrated some exaggeration during the testing." (Tr. 47)

expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").[11]  He stated:

> The claimant has not alleged depression as a disabling impairment. The record shows she has been diagnosed with depression, but she was not prescribed any medication until September 2010. (Exhibit 18F) The first discussion of bipolar/depression occurred on June 13, 2008 when the global assessment of functioning score was 45 (Exhibit 3F). The global assessment of functioning score remained at 45 on August 11, 2008 (Exhibit 1F/1); however, [the GAF score] had drastically improved by November 25, 2008 to 60. (Exhibit 4F/6-12) She was seen by therapists for about one month from March 23, 2009 until April 13, 2009, but then cancelled late on three occasions, [and was] ultimately discharged as a result of her poor attendance and lack of follow-through. (Exhibit 16F) The claimant did not seek further attention until September 2010 when she was prescribed medication (Exhibit 18F); however, she testified at the hearing that she is not currently taking any medications. Thus, depression has not been established as a severe impairment as there is no 12-month period during which the record establishes treatment.

(Tr. 39-40)

Under the Social Security Act and agency regulations, an impairment can be "severe" even though a claimant has not received 12 months of medical treatment. The issue to be determined at step two of the sequential evaluation process is simply "whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months."[12]  _Kluesner v. Astrue_, 607 F.3d 533, 537 (8th Cir. 2010).

---

[11] If a claimant "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, [the Commissioner] will find that [the claimant is] not disabled."  20 C.F.R. § 416.920(a)(4)(ii).

[12] The evidence shows Plaintiff was diagnosed with depression several times between June 2008 and September 2010.  On June 10, 2008, Dr. Filcheck evaluated

An impairment is "severe" if it "significantly limits [claimant's] physical or mental

---

Plaintiff at Capstone Behavioral Health and diagnosed her with "bipolar I disorder, most recent episode, depressed, moderate," and "borderline personality disorder" (Tr. 309). On August 11, 2008, Dr. Schmidt at OMNI Behavioral Health likewise diagnosed Plaintiff with "major depressive disorder, single episode, moderate severity," and "rule out borderline intellectual functioning" (Tr. 316). The state agency's consultative psychologist, Linda Schmechel, Ph.D., noted that Plaintiff's records "consistently reflect problems with depression, temper and BIF [borderline intellectual functioning]" (Tr.380). On November 25, 2008, Mr. Erickson at Alegent Health diagnosed Plaintiff with "depressive disorder, not otherwise specified," and "rule out borderline personality" (Tr. 346). Plaintiff was again diagnosed with "depressive D/O NOS" when she saw another therapist at Alegent Health on December 24, 2008, and February 5, 2009. (Tr. 339, 391). On December 31, 2008, Dr. Rizzo diagnosed "rule out depressive disorder, NOS," and "borderline mental retardation" (Tr. 353). On February 3, 2009, Dr. McLeod saw Plaintiff at Alegent Health and diagnosed her with "depressive disorder, not otherwise specified," and "dependent personality" (Tr. 396). In a disability report prepared on February 18, 2009, Plaintiff indicated she was taking Lexapro for treatment of depression and anxiety, but that it was causing her to sleep a lot; the prescription was written by James Sullivan, M.D., at Alegent Health (Tr. 249). In another disability report prepared on March 25, 2009, Plaintiff indicated that Dr. Sullivan had changed her prescription to Cymbalta, but that this antidepressant was causing weight gain (Tr. 255). On August 13, 2010, Dr. Doyle diagnosed Plaintiff with "bipolar disorder—most recent episode—depressed" and "borderline mental retardation" (Tr. 409). Dr. Doyle indicated that Plaintiff's depression was characterized by appetite disturbance with change in weight, sleep disturbance, decreased energy, and feelings of guilt or worthlessness (Tr. 415). She opined that Plaintiff had "no limitations" in nearly all areas of work functioning, except that she was likely to have uncontrolled crying spells (Tr. 410-412). On September 16, 2010, Plaintiff was evaluated by Ashley Wheeler, M.D., in the psychiatry department of the Nebraska Medical Center, and was diagnosed with "mood disorder, not otherwise specified," "rule out major depressive disorder," "rule out bipolar disorder," "possible mild mental retardation," and "rule out any learning disabilities" (Tr. 444). Plaintiff was prescribed Celexa for treatment of her depression (Tr. 444). Finally, Dr. Fabry noted during a mental status exam on September 23, 2010, that Plaintiff had difficulties with concentration and he diagnosed her with "depression (NOS)," "somatization disorder," and "dependent personality disorder" (Tr. 436).

ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (quoting 20 C.F.R. § 416.920(c)).

Thus, the ALJ's conclusion that "depression has not been established as a severe impairment as there is no 12-month period during which the record establishes treatment" is wrong as a matter of law. *See Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) ("An ALJ commits legal error if the ALJ fails to correctly follow the sequential evaluation process."). The error was harmless, however, because the ALJ made a finding that Plaintiff has other mental impairments which are severe (*i.e.*, "borderline intellectual functioning and learning disorder") and continued with the sequential analysis, giving due consideration to all of Plaintiff's impairments.

"The failure of an ALJ to find an impairment to be severe at Step 2 . . . is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process." *Matlock ex rel. D.S. v. Astrue*, No. 4:11CV1322 FRB, 2012 WL 4109292, *11 (E.D.Mo. Sept. 19, 2012) (citing *Jackson ex rel. K.J. v. Astrue*, 734 F.Supp.2d 1343, 1361 (N.D.Ga. 2010)). *See also Spainhour v. Astrue*, No. 11-1056-SSA-CV-W-MJW, 2012 WL 5362232, *3 (W.D.Mo. Oct. 30, 2012) ("[A]ny error, with regard to which of [plaintiff's] impairments are severe and not severe, is harmless because the ALJ considered all of plaintiff's severe and not severe impairments in determining his work limitations. The resulting RFC determination by the ALJ would not be different even if the ALJ found plaintiff's shoulder pain and depression to be severe."); *Johnson v. Commissioner of Social Sec.*, Civil No. 11-1268 (JRT/SER), 2012 WL 4328413, *21 (D.Minn. July 11, 2012) ("[T]he failure to find additional impairments at Step Two does not constitute reversible error when an ALJ considers all of a claimant's impairments in the remaining steps of a disability determination.") (citing numerous cases), *report and recommendation adopted*, 2012 WL 4238389 (D.Minn. Sept. 20, 2012).

Even if the ALJ had designated Plaintiff's depression as a severe impairment at step two, there is no evidence to support a finding at step three that the depression, in combination with Plaintiff's other impairments, meets the requirements of listing 12.04.[13]  Nor did the "non-severe" designation affect the outcome of steps four and five in the disability analysis.  In making an RFC assessment, the ALJ was required to "consider all of [Plaintiff's] medically determinable impairments . . ., including [her] medically determinable impairments that are not 'severe[.]'" 20 C.F.R. § 416.945(a)(2).  The ALJ's decision represents there was compliance with this requirement (Tr. 38), and in an extended discussion regarding the ALJ's assessment of Plaintiff's residual functional capacity the ALJ mentioned depression several times (Tr. 42-47).  In particular, the ALJ referenced Plaintiff's testimony and report to Dr. Doyle about mood changes and crying spells (Tr. 42, 46) and made allowance for this in the hypothetical question he presented to the vocational expert, stating that the claimant should work "in the type of an area where . . . if she wanted to cry, . . . she

---

[13] Paragraph B of the listing requires "[r]epeated episodes of decompensation, each of extended duration," or else that the disorder result in at least two of the following: (1) "[m]arked restriction of activities of daily living"; (2) "[m]arked difficulties in maintaining social functioning"; or (3) "[m]arked difficulties in maintaining concentration, persistence, or pace." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04(B).  There are no episodes of decompensation in Plaintiff's medical history, nor are there any medical opinions indicating she has any "marked" limitations.

In completing a psychiatric review technique form (PRTF) on January 7, 2009, Dr. Schmechel indicated that Plaintiff's mental impairments included "BIF [borderline intellectual functioning], which is classified as an organic mental disorder (listing 12.02); two affective disorders (listing 12.04), "BAD [bipolar affective disorder]" and "MDD [major depressive disorder]," "r/o post traumatic stress reaction," an anxiety-related disorder (listing 12.06); and "borderline personality disorder" (listing 12.08). Dr. Schmechel opined that because of these mental disorders Plaintiff would have "moderate" difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace (Tr. 371, 378).  The PRTF was affirmed as written by another state agency consultative psychologist, Philip Rosenshield, Ph.D., on January 7, 2009 (Tr. 383-387).

could cry for a while."[14] (Tr. 61)   Under these circumstances, no purpose would be served by remanding the case to the ALJ for another step-two determination regarding the severity of Plaintiff's depression.

### B. Step-Three Determination

Plaintiff argues the ALJ next erred at the third step of the sequential evaluation process, by determining that she did not meet the requirements of listing § 12.05C for mental retardation.  "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning[15] initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairments before age 22," and is considered disabling if the requirements of paragraphs A, B, C, or D are satisfied. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. Paragraph C requires "[a] valid Verbal, Performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" Id. "In sum, to meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

---

[14] Although the ALJ's written decision does not include this particular limitation in the RFC assessment, "an arguable deficiency in opinion-writing technique does not require [the court] to set aside an administrative finding when that deficiency had no bearing on the outcome." Buckner v. Astrue, 646 F.3d 549, 559 (8th Cir. 2011) (quoting Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992)).

[15] "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of one in their particular age group, sociocultural background, and community setting." DSM-IV-TR at 42.

The record shows Plaintiff has scored 70 or below on several intelligence tests: She achieved a verbal IQ of 81, performance IQ of 70, and full-scale IQ of 73 on the Weschler Intelligence Scale for Children administered by the Omaha Public School District in 1983(Tr. 283); a verbal IQ score of 80, performance IQ score of 69, and full-scale IQ score of 72 in a repeat test administered by the school district in 1986 (Tr. 285); a WAISC-III full-scale IQ score of 68, verbal IQ score of 69, and performance IQ score of 73 in a test administered by Dr. Fillcheck in June 2008 (Tr. 327); and a WAISC-III full-scale IQ score of 72, verbal IQ score of 76, and performance IQ score of 72 in a repeat test administered by Dr. Rizzo in December 2008 (Tr. 351).[16]

The first two intelligence tests were administered when Plaintiff was between 5 and 8 years old, but the mere fact that her performance IQ was measured at 69 or 70 at a young age is not determinative (even assuming the existence of another mental or physical impairment imposing an additional and significant functional limitation). For example, in *Cheatum v. Astrue*, 388 Fed. Appx. 574, 2010 WL 2982819 (8th Cir. 2010) (unpublished opinion), the claimant had a verbal IQ score of 69 at age fifteen and suffered from the additional impairment of lupus. "The ALJ denied benefits, however, reasoning that [the claimant] failed to establish deficits in adaptive functioning initially manifested before age 22 as is required by the introductory paragraph of Listing 12.05." *Id.* at 576.  While conceding that the claimant met the 3-part test outlined in *Maresh*, the Eighth Circuit pointed out that it had expressly stated in *Maresh* that "the requirements in the introductory paragraph of listing 12.05 are mandatory," and that "[t]hose requirements clearly include demonstrating that the claimant suffered 'deficits in adaptive functioning' and that those deficits 'initially manifest during the developmental period [before age 22].'" *Id.*

--------

[16] Dr. Schmechel observed that the most recent test scores might not be valid because of a "practice effect."  (Tr. 380)

-17-

In the present case, the ALJ found no evidence that Plaintiff had exhibited deficits in adaptive functioning before age 22.  He stated:

> The undersigned has considered the findings of the Court noted in *Maresh v. Barnhart*, 438 F.3d 897 (8th Cir. 2006), that the claimant's mental retardation had manifested itself prior to age 22 . . . due to "his exhibition of deficits in adaptive functioning at a young age", there is no indication in the instant case that Ms. Gladden exhibited deficits in adaptive functioning at a young age. The record shows intelligence (IQ) scores between 60 and 70, but the diagnosis has always been borderline intellectual functioning and the school records show she was in special education only in the second grade, moving to regular classes in the third grade. The school psychologist reported she had been mainstreamed 98 percent of the school day and was making average to low average progress in academic areas. She reported she quit school after the seventh grade, but this was due to a pregnancy, and she testified at the hearing that she can read and write. (Exhibit 18E/6) School records show Ms. Gladden attended school until at least the ninth grade where she earned as passing grade of 3 in the fourth quarter in general math, a 3 in ROTC, a 2 in home economics, a 2 in chorus, a 3 in general English, and a 2 in basic reading. (Exhibit 18E/8)

(Tr. 41)

During an assessment at Friendship Program, Inc., in September 2011, Plaintiff reported that "school was difficult for her and she left due to having some struggles with her peers" (Tr. 27), but she previously reported that she left school due to pregnancy (Tr. 304).  Plaintiff also references a notation in the January 1986 school assessment about "snide remarks" being made by her classmates, but the full notation states: "School personnel indicated Francine maintains a good attitude and often appears happy in spite of snide remarks by some classmates."  (Tr. 285) The report also stated that Plaintiff "was reported to be working on grade level last year as a first grader," that as a second grader she was "mainstreamed 98% of the school day . . . with success," and that during the 1986-87 school year she would be place in regular third grade "with continued mainstreaming and transition out of special education."

(Tr. 285-286)  Plaintiff testified that she thought she had to repeat grades (Tr. 76), but the school records indicate she completed ninth grade on schedule in 1993 (Tr. 288). Finally, Plaintiff states that she has never had any meaningful employment, but there is no evidence from which it may be concluded that her low IQ prevented her from getting or keeping a job.  In short, the record fails to show that Plaintiff suffered deficits in adaptive functioning before age 22.

The ALJ also found that "the 'paragraph C' criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  (Tr. 41) The ALJ qualified this finding by stating that "[t]he claimant does have intelligence test scores within the range of 60 to 70 (Exhibits 18E, 3F); however, the additional impairment, i.e., her learning disorder has not imposed 'significant' work-related limitation of function as required by the Listing."  (Tr. 41) Specifically, the ALJ determined there is no "significant" limitation because "despite a learning disability, the claimant can function in a work setting where she can perform unskilled tasks."  (Tr. 41)

"The second component of listing 12.05C does not require that the additional impairment be disabling in itself."  *Box v. Shalala*, 52 F.3d 168, 170 (8th Cir. 1995) (citing *Warren v. Shalala*, 29 F.3d 1287, 1291 (8th Cir. 1994)).  The Eighth Circuit stated in *Box* that the requirement "is satisfied when the effect of an additional impairment on the claimant's ability to perform work is 'more than slight or minimal,'" *id.* (quoting *Cook v. Bowen*, 797 F.2d 687, 690 (8th Cir. 1986)), but the Commissioner has since modified the introductory paragraph of listing 12.05C to clarify that the additional physical or mental impairment must be "severe." *See* 65 Fed.Reg. 50,746 at 50,754 (Aug. 21, 2000) ("In final listing 12.05C . . . we used the word 'an' before the word 'additional' to clarify that the additional impairment must be 'severe' in order to establish 'an additional and significant work-related limitation of function.'"); *id. at 50772* ("We have always intended the phrase [significant work-related limitation of function] to mean that the other impairment is a 'severe'

impairment, as defined in §§ 404.1520(c) and 416.920(c). . ... Therefore, . . . we revised the fourth paragraph of final 12.00A, which explains how we assess the functional limitations of an additional impairment under listing 12.05C.").

In the present case, the ALJ made a step-two finding that Plaintiff has two severe impairments: borderline intellectual functioning and a learning disability.[17] The second prong of listing 12.05C is therefore satisfied.

Although the ALJ erred as a matter of law in finding that Plaintiff does not have an additional "significant" impairment, his other step-three finding that Plaintiff's mental retardation did not manifest itself before age 22 is not contrary to the evidence. Thus, the ALJ's conclusion that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, must stand.

### C. Step-Five Determination

Finally, Plaintiff argues the ALJ made an improper assessment of her residual functional capacity (RFC), which was used at step five of the sequential evaluation process to conclude that she is not disabled.[18]  With respect to Plaintiff's mental abilities, the ALJ found that she "would be limited to unskilled work that does not require her to carry out detailed instructions[,] . . . would have moderate limitation in getting along with peers and supervisors, and would be precluded from dealing with the general public." (Tr. 42) Plaintiff complains that "[o]ne nonexertional impairment that the ALJ does not list is a limitation of pace."  (Filing 18 at 16)  She also claims a need for "additional supervision and repeated instructions."  (Filing 18 at 17)

---

[17]As discussed above, it is also possible that Plaintiff's depression is a severe impairment.

[18] The ALJ determined at step four that Plaintiff has no past relevant work; thus, the disability determination proceeded to step five.

The ALJ made an express finding at step three that "[w]ith regard to concentration, persistence or pace, the claimant has moderate difficulties." (Tr. 40) In making this finding, the ALJ commented: "Throughout the record, the evidence shows the claimant [h]as difficulties in this area, although, not of the severity that would preclude simple work. (Exhibit 5F, 11F/7-9, 14F)." (Tr. 40) The state agency's consultative psychologist also found in a PRTF that Plaintiff would be moderately limited in maintaining concentration, persistence, or pace (Tr. 363-364, 378).

The ALJ's RFC assessment incorporated this limitation by restricting Plaintiff to unskilled work that does not require her to carry out detailed instructions. *See, e.g., Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (finding that "the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures [the claimant's] deficiencies in concentration, persistence or pace" attributable to his borderline intellectual functioning); *Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir.1997) (holding that hypothetical including the "ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently describes deficiencies of concentration, persistence or pace). Although not a limitation that is included in the RFC assessment contained in the ALJ's written decision, the ALJ also asked the vocational expert (VE) in considering available employment opportunities to assume that the hypothetical claimant "has a limited [ability], probably at the moderate level, to focus and concentrate for extended periods." (Tr. 60) The hypothetical adequately accounted for all of Plaintiff's mental impairments as found by the ALJ. *See Buckner v. Astrue*, 646 F.3d 549, 560-61 (8th Cir. 2011) (hypothetical to VE must capture concrete consequences of claimant's impairments).

Plaintiff's representative posited an alternative hypothetical in which the VE was asked to "assume that the claimant's work pace would be about 50 percent of a competitive work pace." (Tr. 60)  Not surprisingly, the VE replied that such an individual "wouldn't be able to . . . do competitive work." (Tr. 60).  This hypothetical apparently was premised on a report prepared by Colleen Wessel, an evaluator for

-21-

WESCO Industries, which indicated that Plaintiff's highest production pace during testing was 36.6 percent (Tr. 266-69). The ALJ discounted this report, and rejected the alternative hypothetical, stating:

> On August 18, 2010, upon referral by her representative, the claimant was evaluated at WESCO Industries by Colleen Wessel to determine her functioning in a work-type setting. She was given several tasks that were simple and unskilled, but the greatest production rate was 36.6 percent. She often had to be redirected, leading the evaluator to opine she would have difficulty maintaining an unskilled job due to her low quantity of work, her numerous health issues, and the need for additional supervision and repeated instructions. (Exhibit 13E) While the undersigned has considered this opinion from a source who is "not an acceptable medical source" and given it some weight pursuant to Social Security Ruling 06-3p, it is noted that Ms. Wessel has expressed an opinion on an issue reserved for the Commissioner. Indeed, the testing shows Ms. Gladden produced a low quantity of work and her production pace at the highest was 36.6 percent. Despite this, however, the undersigned is not persuaded by the overall record that the claimant would function at this rate of production on a consistent basis. Since the representative arranged the exam, it is reasonable to conclude that the claimant would be aware that a less than favorable outcome would bolster her claim of disability. While the examiner was of the opinion the claimant gave full effort on the testing, the undersigned is simply not convinced based on the overall record that Ms. Gladden could not produce work at a greater pace of production.

> The representative posed a hypothetical question to the vocational expert, asking if an individual whose work pace was at the 50 percent range, would be affected in her ability to do anything, to which the expert answered "yes." The undersigned does not find a medical opinion in the record that Ms. Gladden would be restricted to only a 50 percent work pace. Dr. Doyle noted she had a processing speed of 71, two standard deviations below average, but this does not appear to the undersigned to equate to a 50 percent work pace. Even her treating source, Dr. Schmidt, opined she could do single, simple tasks. (Exhibit 1F/1)

(Tr. 47)

Essentially, the ALJ determined that Plaintiff's test results, like her testimony, were not credible and were inconsistent with medical evidence in the record.  As set forth previously, the ALJ discussed the fact that Dr. Fabry, who examined Plaintiff in September 2010 at the ALJ's direction, found that her Minnesota Multiphasic Personality Inventory results were invalid because she over reported psychological difficulties.   In addition, Dr. Fabry noted "there was some inconsistency in her responding truthfully."  (Tr. 436) The ALJ also pointed out that "Dr. Filcheck noted on June 13, 2008 that several tests were invalid due to the claimant's elevated responses, but opined this was a 'cry for help.' (Exhibit 3F)" (Tr. 45)  Considering this and other evidence indicating Plaintiff's lack of credibility, the ALJ's decision to give little weight to the WESCO work evaluation was appropriate. "Where adequately explained and supported, credibility findings are for the ALJ to make." *Lowe v. Apfel*, *226 F.3d 969, 972 (8th Cir. 2000)*.

### IV. Conclusion

The ALJ erred as a matter of law at step two by finding Plaintiff's depression "non-severe" because it was not treated for a period of 12 months, but such error was harmless. The ALJ also erred as a matter of law at step three by finding Plaintiff does not satisfy paragraph C of listing 12.05 for mental retardation, but he properly determined there was no showing of deficits in adaptive functioning before age 22; thus, his conclusion that Plaintiff does not meeting listing 12.05C is affirmed.  The ALJ's RFC assessment and step-five finding of "no disability" are supported by substantial evidence on the record as a whole and are not contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

January 14, 2013.                              BY THE COURT:

                                               *Richard G. Kopf*
                                               Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.